IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREGORY CARLSON AND CHRISTINA CARLSON, H/W, 237 Southview Drive Delran, NJ 08075 :::: PLAINTIFFS : : NO. vs. : **TROOPER WARREN (BADGE No. 8259)** c/o NEW JERSEY STATE POLICE : BORDENTOWN STATION 389 US Route 30 : Bordentown, NJ 08505 AND : **TROOPER V.M. VERITAS (BADGE No. 8252)** c/o NEW JERSEY STATE POLICE : BORDENTWON STATION 389 US Route 30 : Bordentown, NJ 08505 AND : **SGT. S.V. MOTTOLA (BADGE No.6517)** c/o NEW JERSEY STATE POLICE : BORDENTWON STATION 389 US Route 30 : Bordentown, NJ 08505 AND : **NEW JERSEY STATE POLICE SUPERVISORS, SERGENANTS AND TROOPERS JOHN/JANE DOES 1-10** : DEFENDANTS | |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

### Nature of Action

1. This is an action for monetary, and other appropriate relief brought by Plaintiffs, Gregory Carlson and Christina Carlson, husband and wife, to address violations by the Defendants of clearly established rights secured to Plaintiffs by the constitutions of the United

States of America, and the statutes of the United States of America, for harm and losses suffered by Plaintiffs caused by Defendants' unlawful actions, practices and customs arising from a police vehicle pursuit of an unknown/unidentified vehicle and the deployment of spike strips by a New Jersey state trooper which targeted Plaintiff Gregory Carlson, an innocent bystander.

2. This action arises under 42 U.S.C. Section 1983, 1988, <u>Monel v. Dept of Social Services</u>, 436 U.S. 658, 690 (1978).

### **Jurisdiction**

3. Jurisdiction is invoked pursuant to 28 U.S.C. Sections 1331 and 1343, as Plaintiffs have alleged violations of federal law.

4. This Court has jurisdiction over Plaintiffs' state law claims pursuant to its supplemental jurisdiction as codified at 28 U.S.C. Section 1367.

### **Parties**

5. Plaintiffs, Gregory Carlson and Christina Carlson, husband and wife, are adult individuals and residents of the State of New Jersey, residing at 37 Southview Drive, Delran, NJ 08075.

6. Defendant, New Jersey State Trooper Warren (first name unknown)(Badge #8259), was, at all times relevant hereto, a New Jersey state trooper assigned to the Bordentown station and/or unit of the New Jersey state police. He is sued in his individual capacity and his official capacity as a New Jersey state trooper.

7. Defendant, New Jersey State Trooper V. M. Veritas (Badge#8252), was, at all

times relevant hereto, a New Jersey state trooper assigned to the Bordentown station and/or unit of the New Jersey state police. He is sued in his individual capacity and his official capacity as a New Jersey state trooper. He is also being sued for supervisor liability pursuant to Monel v. Dept of Social Services, 436 U.S. 658, 690 (1978).

8. Defendant, New Jersey Police Sgt. S. V. Mottola (Badge #6517), was, at all times relevant hereto, a Sergeant employed by the New Jersey state police assigned to the Bordentown station and/or unit of the New Jersey state police. He is sued in his individual capacity and his official capacity as a New Jersey state trooper.

9. Defendants New Jersey State Police supervisors, sergeants and troopers John/Jane Does 1-10 were supervisors, officers, training officers or other New Jersey state police personnel. Plaintiffs do not presently know the names of these defendants after conducting a reasonable search. Plaintiffs expect to learn the names of these additional individuals through formal discovery and will promptly take steps to substitute actual names for these fictitious names. It is believed and therefore averred that these individuals in some manner contributed to the damages sustained by plaintiffs, including failure to properly train New Jersey state troopers in vehicular pursuit policies, and in particular the deployment of spike strips as more fully described below.

**Facts**

10. On Saturday morning April 13, 2019, at approximately 4:45am, Plaintiff Gregory Carlson was operating his silver 2015 Honda Civic northbound on I-295 on his way to work at Marshall Industrial Technologies in Trenton, NJ where he was employed as an engineer.

11. At all times relevant hereto, I-295 is divided highway separated by a median with

3 northbound lanes and a posted speed limit of 65mph.

12. At all times Plaintiff Gregory Carlson was traveling in the center of the 3 northbound lanes and maintained a posted speed of 65 mph.

13. At approximately midway between the Burlington and Florence Exits of northbound I-295,m Gregory Carlson passed two marked New Jersey state police cars situated on the median of the highway which separates the northbound and southbound lanes of I-295. Plaintiff passed by the marked New Jersey state police cars without incident.

14. Shortly thereafter, Plaintiff observed another New Jersey state police marked vehicle also in the left median.

15. As Plaintiff continued northbound approaching the lone New Jersey state police marked patrol vehicle and reached an approximate distance of 50 yards of the aforesaid vehicle, Defendant Trooper Warren Bade #8259 ran out from a position adjacent to his marked Vehicle into the left lane of northbound I-295 and deployed a set of spike strips into the middle lane of travel directly in front of Gregory Carlson's silver 2015 Honda Civic.

16. Plaintiff Gregory Carlson was unable to avoid running over the spike strips, which immediately deflated the front left tire, causing his vehicle to quickly decelerate as a result of which Plaintiff lost control of his vehicle temporarily. Fortunately, he was able to maneuver his vehicle over to the right shoulder of the northbound I-295 lanes.

17. Once Plaintiff Gregory Carlson moved his vehicle safely off of the road onto the right shoulder, he looked into his rearview mirror and observed Trooper Warren deploying the spike strip a second time attempting to deflate the tires of a large white 4 door construction type pickup truck outfitted with a ladder rack, side pack tool lockers and appearing similar to the type

of vehicle used by utility or construction companies.

18. Plaintiff Gregory Carlson observed the large construction type pickup truck swerve and successfully avoid Trooper Warren's second deployment of spike strips. The white 4 door construction type pickup truck continued northbound on I-295 without stopping.

19. Within a very short period of time after observing the construction vehicle avoid the spike strips and continue traveling northbound on the highway, Plaintiff observed 2 New Jersey state police vehicles pass by at a high rate of speed with its red and blue roof lights activated. Within seconds of that observation, Plaintiff observed an additional 2 marked New Jersey state police vehicles which he believes were the vehicles he observed in the left median moments earlier. Those additional 2 vehicles also passed Plaintiff traveling northbound with their red and blue roof lights activated.

20. Plaintiff then attempted to flag down Trooper Warren, who had pulled the spike strip off the roadway, packed it into his vehicle and began traveling northbound at a high rate of speed with his red and blue roof lights activated.

21. At no point did any of the New Jersey state police troopers that Plaintiff observed on the scene stop and approach Plaintiff to check on his condition or otherwise initiate contact.

22. Plaintiff then called 9-1-1 and was transferred to the Bordentown barracks of the state police and was informed by the trooper who answered his call that other troopers from the Bordentown barracks were in a vehicle pursuit and that the answering trooper would dispatch aide to the scene.

23. As Plaintiff remained in his vehicle at the scene, he began to feel pain and stiffness throughout his body. After approximately 15 minutes when no state police vehicle

arrived to aide Plaintiff, he called back was advised that no personnel from the Bordentown barracks was available and that no assistance would be coming to Plaintiff's aid. After another 10-15 minutes as Plaintiff's pain increased, he called 9-1-1 a third time and requested medical assistance.

24. First responders from Endeavor Ambulance Service and a fire crew arrived on the scene and rendered assistance to Plaintiff. At this time, a New Jersey state trooper also arrived and took control of Plaintiff's disabled vehicle while Plaintiff was attended to by the EMTs.

25. While on the scene, the EMTs checked Plaintiff's vital signs. His blood pressure was 180/120 and the EMTs were concerned of a possible cardiac event and accordingly, transported Plaintiff via ambulance to Virtua Memorial Hospital-Mount Holly, where he arrived at approximately 6:00AM. In addition, because Plaintiff was complaining of pain in his neck, his neck was immobilized at the scene by the EMTs prior to the ambulance trip to the hospital.

26. As a result of Trooper Warren's deployment of spike strips in front of Plaintiff's path of travel and the resulting rapid deflation of his front tire and deceleration of the speed of the vehicle in a short period of time, Plaintiff sustained bodily injuries more particularly set forth at below.

27. As a direct and proximate result of the conduct of the Defendants in deploying the spike strips, Plaintiff Gregory Carlson sustained injuries including but not limited to his neck, shoulder, left arm, left hand, lower back, left leg and right knee, together with a shock to his nerves and nervous system by reason of which he was rendered sick, sore, lame and disordered, and was made to undergo mental anguish and physical pain, as a result of which he has suffered and will continue to suffer for an indefinite time in the future.

28. As a further direct and proximate result of the Defendants' actions as described above, Plaintiff underwent epidural injections and surgery to his left rotator cuff (exacerbation of a previous injury repaired by surgery), surgery to his neck and lower back.

29. All of Plaintiff's injuries are serious and/or permanent in nature.

30. As a further direct and proximate result of the Defendants' conduct as described above, Plaintiff incurred necessary and reasonable medical expenses.

31. As a further direct and proximate result of the Defendants' conduct as described above, Plaintiff has suffered physical pain, mental anguish and humiliation, and he will continue to suffer the same for an indefinite time in the future.

32. As a further result of the conduct of the Defendants as described above, Plaintiff Gregory Carlson was caused and continue to be caused to sustain a loss of life's everyday enjoyment and pleasures to his great distress and overall discomfort.

33. As a further direct and proximate result of the Defendants' conduct, as aforesaid, Plaintiff has suffered loss of ages and loss of earning capacity, and was unable to continue in his employment as an engineer.

34. At no time was Plaintiff Gregory Carlson the subject or target of any police pursuit; rather, he was an incident victim of the reckless and indiscriminate deployment of spike strips by Trooper Warren.

35. Without just cause or legal justification, Trooper Warren indiscriminately deployed spike strips in front of Plaintiff's vehicle as he was traveling at approximately 65mph northbound in the center lane of I-295.

## NATIONWIDE SPIKE STRIP CONTROVERSY

36. Tire deflation devices known as spike strips or stop sticks were introduced in 1996 as a safe alternative to end police pursuit of suspects eluding law enforcement in vehicles. Initially viewed by law enforcement agencies as a safe alternative to a high speed vehicle pursuit, spike strips have presented safety problems for both law enforcement officials and the public. The *Officer Down Memorial page,* a website run by a non-profit that catalogs line-of-duty deaths of law enforcement officials counts more than 20 officers killed by cars while trying to deploy spike strips between 1996 and 2010.

37. In September 2012, after a number of fatal crashes involving spike strips, the FBI issued a bulletin urging law enforcement agencies to explore other ways to handle chases. The bulletin noted the number of deaths of law enforcement officers involving the use of spike strips noting that they pose "a real danger for law enforcement officers." (See Officer Down Memorial page *Officers Killed While Deploying Spike Strips*, http://blog.odmp.org/2010/09/ officers killed-while-deploying-spike.html (accessed April 2, 2012). The bulletin advised that "law enforcement agencies should way other options, such as the pit maneuver, to end high speed chases. Departments can also consider the increased use of aerial surveillance to track an offender's location relative to that of an officer placing the spike strip. Moreover, radio communication could help confirm that a subject is too far way to reach a location of an office during deployment. Further, new technology that could disable cars involved in high speed chases may reduce the risk to officer safety.

38. In addition to posing a risk of serious injury and/or death to law enforcement

officers, the deployment of spike strips have killed and injured incident third party motorist and pedestrians who are struck by vehicles attempting to evade spike strips.

39. In a New York Times article dated July 4, 2015, noted that spike strips while effective in stopping a vehicle by flattening a suspect's tires, "they can also put law enforcement officers and bystanders into death's crosshairs. At least 30 people have been killed in the two decades since spike strips became popular, some victims intentionally run over by drivers trying to evade capture at any costs and others struck by cars careening wildly on punctured tires." Jim Bueermann, President of the Police Foundation, a policy research group was quoted in the Times article indicating that many law enforcement agencies have placed restrictions on pursuit policies, including the use of spike strips by setting speed limits, and allowing such vehicle pursuits only after felonies or even requiring the pursuit to end once the police know the suspect's identity and can apprehend suspect later. "Are you going to apprehend all offenders at any cost?" Mr. Bueermann said "most of the time they are running for very benign reasons – they have warrants or it's a stolen car. And is chasing a stolen piece of metal worth it?"

40. Recognizing the balance of risk of injury or death versus effectively stopping pursued vehicles, the New Jersey Office of Attorney General has issued a Police Vehicular Pursuit Policy, which is revised from time-to-time. As the previce to the vehicular pursuit policy noted the "New Jersey Task Force on Police Vehicular Pursuit Policy was mindful of the requirement that such a policy appropriately weigh a police officer's sworn duty to apprehend law breakers with the obligation to protect life and the public safety." A requirement of the July 2009 revision of the policy require that "all law enforcement officers engaged in pursuit incidents file a pursuit incident report" noting that "any sound vehicular pursuit policy is

officers, the deployment of spike strips have killed and injured incident third party motorist and pedestrians who are struck by vehicles attempting to evade spike strips.

39. In a New York Times article dated July 4, 2015, noted that spike strips while effective in stopping a vehicle by flattening a suspect's tires, "they can also put law enforcement officers and bystanders into death's crosshairs. At least 30 people have been killed in the two decades since spike strips became popular, some victims intentionally run over by drivers trying to evade capture at any costs and others struck by cars careening wildly on punctured tires." Jim Bueermann, President of the Police Foundation, a policy research group was quoted in the Times article indicating that many law enforcement agencies have placed restrictions on pursuit policies, including the use of spike strips by setting speed limits, and allowing such vehicle pursuits only after felonies or even requiring the pursuit to end once the police know the suspect's identity and can apprehend suspect later. "Are you going to apprehend all offenders at any cost?" Mr. Bueermann said "most of the time they are running for very benign reasons – they have warrants or it's a stolen car. And is chasing a stolen piece of metal worth it?"

40. Recognizing the balance of risk of injury or death versus effectively stopping pursued vehicles, the New Jersey Office of Attorney General has issued a Police Vehicular Pursuit Policy, which is revised from time-to-time. As the previce to the vehicular pursuit policy noted the "New Jersey Task Force on Police Vehicular Pursuit Policy was mindful of the requirement that such a policy appropriately weigh a police officer's sworn duty to apprehend law breakers with the obligation to protect life and the public safety." A requirement of the July 2009 revision of the policy require that "all law enforcement officers engaged in pursuit incidents file a pursuit incident report" noting that "any sound vehicular pursuit policy is

officers, the deployment of spike strips have killed and injured incident third party motorist and pedestrians who are struck by vehicles attempting to evade spike strips.

39. In a New York Times article dated July 4, 2015, noted that spike strips while effective in stopping a vehicle by flattening a suspect's tires, "they can also put law enforcement officers and bystanders into death's crosshairs. At least 30 people have been killed in the two decades since spike strips became popular, some victims intentionally run over by drivers trying to evade capture at any costs and others struck by cars careening wildly on punctured tires." Jim Bueermann, President of the Police Foundation, a policy research group was quoted in the Times article indicating that many law enforcement agencies have placed restrictions on pursuit policies, including the use of spike strips by setting speed limits, and allowing such vehicle pursuits only after felonies or even requiring the pursuit to end once the police know the suspect's identity and can apprehend suspect later. "Are you going to apprehend all offenders at any cost?" Mr. Bueermann said "most of the time they are running for very benign reasons – they have warrants or it's a stolen car. And is chasing a stolen piece of metal worth it?"

40. Recognizing the balance of risk of injury or death versus effectively stopping pursued vehicles, the New Jersey Office of Attorney General has issued a Police Vehicular Pursuit Policy, which is revised from time-to-time. As the previce to the vehicular pursuit policy noted the "New Jersey Task Force on Police Vehicular Pursuit Policy was mindful of the requirement that such a policy appropriately weigh a police officer's sworn duty to apprehend law breakers with the obligation to protect life and the public safety." A requirement of the July 2009 revision of the policy require that "all law enforcement officers engaged in pursuit incidents file a pursuit incident report" noting that "any sound vehicular pursuit policy is

necessarily based on complete and accurate information about pursuit incidents." Moreover, "the task force considered entire range of incidents for which police officers are now required to file formal reports and concluded that **vehicular pursuits would rank among the most critical on any such list.**" Among the restrictions imposed by the 2009 policy revision were the command that "no more than 2 police vehicles (primary unit and secondary unit) shall become actively involved in a pursuit unless otherwise specifically directed by a supervisor."

41. The New Jersey Vehicle Police Pursuit policy addresses the issue of "authorized tire deflation devices" and required that prior to the deployment and use of an authorized tire deflation device, the law enforcement agency shall

> 1. Modify its vehicular pursuit policy to provide for the proper use of the authorized tire deflation device; and
>
> 2. Train all officers in the use of the authorized tire deflation device.
>
> a) training must include practical, hands-on operation of the authorized tire deflation device.

Further, the policy mandates that an authorized tire deflation device may be "utilized only after supervisory approval." Under the section entitled "Deployment" the supervisor "must coordinate the efforts of all law enforcement units involved in the pursuit and the communications operator shall notify all units of the location of the authorized tire deflation device deployment."

42. As noted above, the policy has a reporting requirement in the form of a vehicle pursuit report which mandates that the date time and location of deployment and activation, the officer who deployed and active the authorized tire deflation device be identified and the results of the use of the authorized tire deflation device be reported whether it be on the pursuit

vehicle, on other vehicles, property of people."

43. The role of the supervisor is critical according to the New Jersey Police Vehicular Pursuit Policy. It requires the supervisor to immediately decide whether the pursuit should continue upon learning of same. It further states

A. The supervisor shall permit a pursuit to continue only if:

1. There is reasonable belief that the violator has committed an offense of the first or second degree, or an offense enumerated in Appendix A of this policy, or

2. There is a reasonable belief that the violator poses an immediate threat to the safety of the public or other police officers.

Supervisor shall "also order the pursuit terminated if the suspect's identity is established to the point where later apprehension may be accomplished and where there is no immediate threat to public safety." Appendix A to the New Jersey Police Vehicular Pursuit policy identifies the following offenses as a those in which a vehicular pursuit may be authorized:

1. Vehicular homicide, 2C:11-5;

2. Aggravated assault, 2C:12-1b;

3. Criminal restraint, 2C 13:-2;

4. Aggravated criminal sexual contact, 2C:14-3a;

5. Arson, 2C:17-1b;

6. Burglary, 2C:18-2;

7. Automobile theft, 2C:20-2;

8. Theft by extortion, 2C:20-5;

9. Escape, 2C:29-5; and

10. Manufacturing, distributing or dispensing of CDS, 2C:35-5b.

44. In an effort to determine the facts and circumstances of, inter alia, including the nature of the crime involving the pursued vehicle, Plaintiff submitted a written request to obtain copies of state police reports and photographs in the form required by Division of State Police, Dept of Law & Public Safety on May 15, 2019. By response, Plaintiff was informed that the records requested cannot not be obtained as public records to the Criminal Justice Records Bureau therefore, they cannot be released. To obtain other records including computer aided dispatch (CAD) abstract reports, taped statement, video, radio and 9-1-1 call tapes via subpoena issued by a Court of competent jurisdiction. Accordingly, Plaintiff does not at the time of filing this Complaint have in his possession details about the nature of the vehicle being pursued.

## COUNT I -VIOLATION OF CIVIL RIGHTS (FOURTEENTH AMENDMENT)
## PLAINTIFFS v. DEFENDANTS

45. Plaintiffs incorporate all preceding paragraphs as if fully set froth at length below.

46. Gregory Carlson has a clearly established protected right under the Due Process clause of the Fourteenth Amendment to the U.S. Constitution as that clause protects Plaintiff form governmental action including the action of Trooper warren which resulted in serious bodily injuries suffered by Plaintiff.

47. Under any subjective standard, Trooper warren could not have believed that Gregory Carlson was the subject or target of the police pursuit as is demonstrated by Trooper Warren's actions in discriminately deploying the spike strips first against Gregory Carlson and then immediately thereafter against a large pickup truck equipped with side panels, ladders and presenting a different visual profile to the trooper then Carlson's silver Honda Civic.

48. It is clear that Trooper Warren was indiscriminately deploying the spike strips without regard to the identity of the vehicle being pursued.

49. Thus, the indiscriminate actions of Trooper Warren against Plaintiff Gregory Carlson constitute due process violation of a clearly established right to be free and governmental interference and physical harm.

50. The actions of Trooper Warren, as described above violated Plaintiff's due process rights.

51. As a direct and proximate result of that violation, Gregory Carlson suffered injuries as set forth above.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants as follows:

    a. compensatory damages
    b. punitive damages
    c. attorney's fees and cost pursuant to 42 U.S.C. Section 1988; and
    d. all other appropriate relief as the Court deems just and proper.

### COUNT II-VIOLATION OF CIVIL RIGHTS (FOURTH AMENDMENT) PLAINTIFFS v. DEFENDANTS

52. Plaintiffs incorporate all preceding paragraphs as if fully set froth at length below.

53. At all relevant times, Defendants, acting under color of law, were deliberately indifferent, acted with malice towards Plaintiff, in violation of the Fourth Amendments ban on excessive force and unreasonable seizure of the person.

54. The disabling of Plaintiff Gregory Carlson's vehicle by the deployment of spike strips by Trooper Warren constitutes a seizure within the meaning of the Fourth Amendment.

55. The aforesaid actions by the Defendant are a violation of 42 U.S.C. Section

1983 which prohibits defendants, acting under color of law to violate Plaintiffs clearly established rights.

56. The conduct of Trooper Warren in deploying the spike strips first against Plaintiff in his Honda Civic, and then against a large pickup truck bearing no reasonable resemblance to Plaintiff's vehicle would, in the minds of any law enforcement officer constate the violation of a clearly established right to be free from improper searches and seizures and to be free from excessive force.

57. The actions of Trooper Warren as described above, violated those clearly established rights secured by the Fourth Amendment to the U.S. Constitution.

58. As a direct and proximate result of that violation, Gregory Carlson was injured as set forth above.

WHEREFORE, Plaintiff demand judgment in his favor and against the Defendants follows:

    a.    compensatory damages
    b.    punitive damages
    c.    attorney's fees and cost pursuant to 42 U.S.C. Section 1988; and
    d.    all other appropriate relief as the Court deems just and proper.

### COUNT III-VIOLATION OF PLAINTIFF'S RIGHTS UNDER <u>MONEL</u>
### PLAINTIFFS v. DEFENDANTS

59. Plaintiffs incorporate all preceding paragraphs as if fully set froth at length below.

60. The actions of Trooper Warren as described above, which were upon information and belief, in violation of the New Jersey Police Vehicular Pursuit Policy were the result of a pattern and practice involving lack of proper training, lack of clear instruction and mandates by Trooper Warren's supervisors and superiors.

61. Under <u>Monel</u>, liability of supervisors can be established when it is shown that lack of training or adherence to clearly established policies and the lack of training resulted directly in Plaintiff's injuries as set forth above.

WHEREFORE, Plaintiff demand judgment in his favor and against the Defendants follows:

    a. compensatory damages
    b. punitive damages
    c. attorney's fees and cost pursuant to 42 U.S.C. Section 1988; and
    d. all other appropriate relief as the Court deems just and proper.

## COUNT IV – PER QUOD
## PLAINTIFF, CHRISTINA CARLSON v. ALL DEFENDNATS

62. Plaintiff, Christina Carlson, wife of Plaintiff, Gregory Carlson, incorporates all preceding paragraphs as if fully set forth hereunder.

63. Solely because of the actions of the Defendants, Plaintiff Christina Carlson, has been obligated to expend various sums of money for medicines and medical attention in and about attempting to effect a cure for the injuries to his wife, and will be obligated to make similar expenditures for an indefinite time in the future.

64. Further, by reason of the aforesaid, Plaintiff Christina Carlson, has been deprived of the comfort, companionship, services, assistance and consortium of her husband, and will be deprived for an indefinite time in the future.

WHEREFORE, Plaintiff, Christina Carlson, demands judgment against the Defendants for money damages, interest, and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Date: April 13, 2021

_____
DANIEL J. HETZNECKER
EARP COHN P.C.
ID #051021992
20 BRACE ROAD, SUITE 400
CHERRY HILL, NEW JERSEY 08034
(856) 354-7700
Attorney for Plaintiffs
dhetznecker@earpcohn.com